15-4174
USA v. Delacruz

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2016

(Argued:  November 14, 2016                          Decided:  July 5, 2017)

Docket No. 15-4174

_____

UNITED STATES OF AMERICA,

                                                    *Appellee*,

                                    - v. -

MIGUEL DELACRUZ,

                                       *Defendant-Appellant.**

_____

Before:  KEARSE, LOHIER, and DRONEY, *Circuit Judges*.

                Appeal from a judgment of the United States District Court for the Southern District

of New York, Katherine B. Forrest, *Judge*, convicting defendant, following his plea of guilty, of

conspiracy to commit robbery, *see* 18 U.S.C. § 1951, and sentencing him principally to 63 months'

imprisonment.  Defendant challenges his sentence, contending principally that the district court

miscalculated his Guidelines-recommended range of imprisonment by erroneously denying him credit

---

    * The Clerk of Court is respectfully directed to amend the caption to conform with the
above.

for acceptance of responsibility. We conclude that the district court denied the acceptance-of-responsibility adjustment based on clearly erroneous factual findings.

Vacated and remanded for resentencing.

NOAH SOLOWIEJCZYK, Assistant United States Attorney, New York, New York (Preet Bharara, United States Attorney for the Southern District of New York, Karl Metzner, Assistant United States Attorney, New York, New York, on the brief), *for Appellee*.

LOUIS R. AIDALA, New York, New York, *for Defendant-Appellant*.

KEARSE, *Circuit Judge*:

Defendant Miguel Delacruz appeals from a judgment of the United States District Court for the Southern District of New York, Katherine B. Forrest, *Judge*, following his plea of guilty, convicting him of conspiracy to commit robbery, in violation of 18 U.S.C. § 1951, and sentencing him principally to 63 months' imprisonment. Delacruz challenges that aspect of his sentence as procedurally unreasonable, contending principally that the court erred in denying him an advisory Sentencing Guidelines ("Guidelines") reduction in offense level in recognition of his acceptance of responsibility for his offense. We agree. We vacate the sentence and remand for resentencing.

## I. BACKGROUND

The prosecution of Delacruz arose out of a sting operation run by the Drug Enforcement Administration ("DEA"), targeting suspected drug dealer Alex Velez. The investigation

culminated in the November 2014 arrests in New York City of Velez and six others including Delacruz ("Velez's crew"), as they believed they were about to carry out a planned robbery of drug dealers. A three-count indictment charged the seven men with (1) interfering with commerce by threat or violence in conspiring to commit such a robbery, in violation of 18 U.S.C. § 1951 (the "robbery conspiracy" or "Hobbs Act" conspiracy) (count one), (2) conspiring to distribute and to possess with intent to distribute the heroin and cocaine they anticipated obtaining in the robbery, in violation of 21 U.S.C. § 846 (the "drug distribution conspiracy") (count two), and (3) carrying and using a firearm in furtherance of those two conspiracies, in violation of 18 U.S.C. §§ 924(c)(1)(a)(i) and 2 (count three). All seven eventually pleaded guilty to one or more of the charges against them.

Velez pleaded guilty to all four counts of a superseding charging document that included the three counts described above, and he entered into a cooperation agreement with the government. Delacruz pleaded guilty to count one, the robbery conspiracy, with the understanding that the other counts against him would be dismissed. His plea agreement with the government estimated that his Guidelines criminal history category was I; that his total offense level, assuming that he clearly demonstrated acceptance of responsibility for his offense, would be 23; and that his Guidelines-recommended range of imprisonment would be 46 to 57 months.

The following description of the relevant events is taken largely from the presentence report ("PSR") prepared on Delacruz by the probation department based on information provided by the government, including DEA surveillance tapes and postarrest-cooperation statements by Velez.

3

A. *The Sting*

Starting in mid-2014, a cooperating witness (the "CW") and a confidential informant (the "CI") (collectively, the "Cooperators") working with the DEA attempted to negotiate cocaine and heroin transactions with Velez, who was reputed to be a large-quantity drug dealer in Philadelphia. When those efforts failed, the DEA had the Cooperators ask Velez to help them collect a debt supposedly owed them by one of their narcotics suppliers. In late September, they told Velez the supplier was soon to have a large shipment of narcotics brought to New York City. They asked Velez to rob the couriers; the Cooperators would take the amount owed them and Velez and his crew could keep the rest. Velez immediately agreed and said he knew people who would help.

Velez asked Delacruz, a close friend since childhood, to participate in the robbery because he needed a driver and knew Delacruz had a car and a valid license. Velez told the government in a postarrest proffer session that he also recruited Delacruz because he knew Delacruz had been involved in selling drugs. Delacruz agreed to be the driver for the robbery and told Velez he would rent a car for the event. Velez eventually added the other five members of his crew for the supposed robbery: Philadelphians Giovanny Falero, Eduardo Vasquez-Torres ("Vasquez"), and Vasquez's friend Ismaeal Feliciano, and two New Yorkers, Velez's nephew Riphy Esquea-Marte ("Esquea"), and Esquea's friend, Fausto Espinosa.

In mid-October, Delacruz drove Velez from Philadelphia to a location in Manhattan (the "Manhattan Location") near 125th Street and 12th Avenue for a meeting with the Cooperators to discuss robbery details. Velez introduced Delacruz as the driver for the robbery, and Delacruz confirmed his participation. After learning from the Cooperators that the drugs would be arriving in an SUV driven by a woman, accompanied by two men who would be armed, Velez stated that his crew would harm the men.

4

On November 5, Delacruz again drove Velez to Manhattan to meet with the Cooperators. The CI asked whether Delacruz would be participating in the robbery; both Velez and Delacruz responded affirmatively. The Cooperators said they expected the supplier's SUV to be carrying 16 kilograms of cocaine and five kilograms of heroin and expected that one of the men in the SUV would be armed. Velez again indicated that his crew would harm the men in the SUV; he said the crew members with robbery experience would be bringing guns.

On November 11, the CW informed Velez by telephone that the SUV would be arriving in New York City with the drug shipment on November 13. On the evening of November 13, Delacruz drove Velez and Falero from Philadelphia to Manhattan in a rented Buick, with Vasquez following, driving a Dodge, with Feliciano and two firearms. Velez informed Delacruz and Falero that the men in the Dodge were armed with guns. When the Buick arrived at the Manhattan Location (the Dodge driven by Vasquez had stopped some distance away), Velez got out to speak with the Cooperators and told them that the other car was nearby. The Cooperators urged him to get the other car closer. Velez complied, and soon both the Buick and the Dodge were parked on 125th Street east of 12th Avenue.

Delacruz then drove the Buick closer to the Manhattan Location, where the Cooperators approached the Buick and spoke to Velez, Delacruz, and Falero. The conversation (as translated from Spanish, and with "..." representing a pause) included the following exchange between the Cooperators and Delacruz:

> [Cooperator]: . . . . You're not getting out, right? Or, why are you going to...? When we arrive there with...with the thing, how...?

> [Delacruz]: No. They're going to fight back and we're ["we[]" subsequently clarified as meaning he and Velez] going to be on backup.

(Transcript of Meeting on November 13, 2014 ("T-100"), at 14.) Delacruz later added:

[Delacruz]: I can assure you that the one in front, that...that tough guy, as you say...

[Cooperator]: Well, that...

[Delacruz]: That guy...that guy is going to cry like a sissy.

(*Id*. at 15.)

Minutes later, the DEA signaled the Cooperators to bring Velez and his crew to the supposed robbery location. The Cooperators began to drive, followed by the Buick, but both cars stopped at 125th Street and 12th Avenue; the CI and Velez exited their respective vehicles and had a conversation. After Velez made gestures as if summoning someone, a Toyota livery cab arrived; Esquea got out and handed Velez a black bag. Falero then exited the Buick, and he, Velez, and Esquea walked toward the Dodge. The CI reentered the Cooperators' car, which resumed driving, followed by the Buick and the Toyota.

After those three vehicles had gone several blocks, law enforcement officers stopped the Buick and the Toyota; they arrested Delacruz, who was alone in the Buick, and Espinosa, who was driving the Toyota. Meanwhile, the Dodge, in its parking spot on 125th Street, had gotten blocked in by buses, and other officers arrested Vasquez and Feliciano in the Dodge and arrested Falero and Esquea as they were trying to enter the Dodge. Velez, carrying the bag just given him by Esquea, had walked past the blocked-in Dodge when he was arrested. Before his arrest he was observed throwing the bag over a construction fence.

Officers recovered the black bag jettisoned by Velez and found inside a loaded semiautomatic firearm. A search of the Dodge revealed two guns, a large knife, gloves, and masks. From the Buick, officers recovered an empty suitcase and an empty fabric bag.

6

B. *Delacruz's Guilty Plea and the Parties' Sentencing Submissions*

In August 2015, Delacruz, pursuant to his plea agreement, pleaded guilty to only the robbery conspiracy count. In describing his conduct, Delacruz stated that

> [f]rom on or about September 2014 to on or about November 13, 2014, I agreed with others to commit a robbery of alleged--alleged drug dealer to take place in the Bronx, New York. In this regard, I was placing a meeting in Manhattan, New York City, where . . . discussions were had to the alleged--
>
> MR. AIDALA [Delacruz's attorney]: Alleged.
>
> THE DEFENDANT: --robbery. My role in this matter was to act as a lookout. I knew it was illegal to do so.

(Plea Hearing Transcript, August 12, 2015, at 11.) Delacruz stated that what they had been planning to steal were drugs. His plea, entered before a magistrate judge, was accepted by the district judge.

The PSR prepared on Delacruz found that he had no prior convictions or arrests, and that he thus had a criminal history category of I. It calculated that his total offense level--including recommended downward adjustments totaling three steps for clearly accepting responsibility for his conduct and for timely agreeing to plead guilty--was 23. His Guidelines-recommended range of imprisonment was therefore 46 to 57 months; the PSR recommended the imposition of 46 months.

Delacruz's attorney Louis Aidala submitted to the district court a sentencing memorandum urging that Delacruz be sentenced to time served--about 13 months. Without faulting the PSR's calculation of the Guidelines-recommended range, Aidala objected to two aspects of the PSR's factual description of the events: (1) the implication Delacruz had been involved in selling drugs and would be compensated for participating in the robbery by receiving drugs to sell, and (2) the implication that Delacruz had said he himself would harm one of the drug couriers.

As to Delacruz's role and anticipated compensation, Aidala stated that

7

Velez agreed to supply four men to commit the robbery and one man as the driver. *Delacruz was to be the driver/lookout*. On the night of the planned "robbery", the defendants arrived in two vehicles, one of which was driven by Delacruz . . . . *No contraband was found in the rented vehicle driven by Delacruz, or on his person*.

(Delacruz Sentencing Memorandum dated November 2, 2015, at 3 (emphases added).) Aidala argued

that Delacruz's role was not to accost the couriers or take the drugs from them (*see id*. at 6), nor was

he to receive drugs as his compensation:

*Delacruz was to have received a fee for driving and being the lookout*. He was not going to sell the purported narcotics or share in the profits, so the claim by Velez that he supposedly recruited Delacruz because he knew him to be engaged in selling narcotics is unconvincing.

(*Id*. (emphasis added).) Aidala argued that there was no basis for Velez's statement that Delacruz had

previously dealt drugs.

As to the PSR's statement that Delacruz had said that Velez's crew would harm one of

the male couriers, Aidala argued that "the transcripts of the meetings that were provided to defense

counsel by the government contain no such statement by Mr. Delacruz." (*Id*. at 3; *see also id*. at 6

(such a statement by Delacruz is "not borne out by the transcripts of said meetings that were provided

to counsel by the government. . . . Delacruz said nothing about their hurting the drug supplier who

was the intended victim of the robbery").)

The government, for its part, urged the district court to impose a term of imprisonment

within the 46-to-57 month range recommended by the PSR. As to Delacruz's objections to the PSR's

statements that Delacruz had previously dealt drugs and planned to sell the drugs to be stolen from the

couriers, the government stated that

given the seriousness of Delacruz's offense conduct, *a sentence within the Guidelines Range of 46 to 57 months' imprisonment is warranted regardless*

8

*of whether the Court makes a finding with respect to Delacruz's narcotics trafficking activities prior to the instant offense.* Similarly, the defense claims that Delacruz was only to receive a fee for driving and being a lookout but that he was not going to sell the purported narcotics or share in the profits. . . . This is inconsistent with the information provided by Alex Velez during his proffer sessions with the Government. Again, because of the serious nature of Delacruz's offense conduct, *the Government respectfully submits that a sentence within the Guidelines Range of 46 to 57 months' imprisonment is warranted regardless of whether Delacruz was to be compensated with a fee or with a share of the profits from selling the drugs. How Delacruz was to be compensated is ultimately irrelevant to his culpability.* There is no dispute that Delacruz was to be paid to be a participant in a robbery that he knew was to be a violent robbery of drug dealers using firearms. This is gravely serious conduct irrespective of how Delacruz was to be compensated for his role.

(Government Letter to Honorable Katherine B. Forrest dated November 11, 2015 ("Government Sentencing Memorandum"), at 2 n.1 (emphases added).)

In response to the contention that none of the surveillance recordings showed Delacruz stating that he would harm one of the couriers, the government stated that Velez had identified the voice that said one of the couriers was "going to cry like a sissy" as the voice of Delacruz. (Government Sentencing Memorandum at 4 n.2 (internal quotation marks omitted).) It pointed out that Delacruz was present when Velez told the Cooperators that some members of the crew intended to harm the couriers. (*See id*. at 5.) However, the government argued that regardless of the attribution or interpretation of the "cry like a sissy" statement, a prison term for Delacruz within the range of 46-57 months was warranted. (*See id*. at 4 n.2.)

Opposing Delacruz's request for a sentence of time-served, the government argued that

[a] substantial sentence is necessary in this case to reflect the nature, circumstances, and seriousness of the offense, to promote respect for the law, and to provide just punishment. . . . While the defense in its submission claims that Delacruz "was not part of the actual robbery crew but was rather the driver/lookout," (Delacruz Submission at 6), this characterization understates Delacruz's role substantially. Delacruz, in fact, like all of his six other co-

9

defendants, was an integral part of the robbery crew. *Different members of that robbery crew played different roles. Delacruz's role was to act as a driver of the one of the vehicles that would carry the stolen narcotics.* Furthermore, Delacruz was present for crucial planning meetings leading up to the planned robbery. Delacruz drove from Philadelphia to New York City with Velez on two separate occasions in order to meet with the CW and the CI to discuss the robbery. *Delacruz was relatively quiet during these meetings, as is reflected in the transcripts and recordings of the meetings, and he was introduced by Velez as the driver for the robbery.* Nevertheless, he was present for discussions that covered all of the relevant details of the planned robbery: the quantity of drugs that would be stolen, the means that would be used to achieve that end, and the fact that [the] robbery crew would bring firearms to effectuate the robbery. . . . Furthermore, the fact that the robbery crew would harm the male occupants of the SUV carrying the narcotics was also discussed in Delacruz's presence. . . . In addition, on the day of the robbery itself, following the meeting at the gas station, Velez told Delacruz and Falero that Vasquez-Torres had brought firearms with him to commit the robbery, and that he had these firearms stored inside of the Dodge. . . . Accordingly, when Delacruz drove *with the other members of the robbery crew to New York City on November 13, 2014, he understood full well that he was about to participate in a violent, armed robbery of drug dealers*.

(*Id*. at 5. (emphases added).) However, the government noted that Delacruz was the only defendant who had been allowed to plead guilty just to count one, which--unlike the drug distribution conspiracy and firearm counts--carried no mandatory minimum term of imprisonment. It stated that

this was due to the fact that the Government determined that *Delacruz's offense conduct--while quite serious--was less serious than that of his co-defendants because Delacruz was solely to act as the driver for the robbery*.

(Government Sentencing Memorandum at 6 (emphasis added).)

C. *The* Fatico *Hearing*

By order dated November 13, 2015, the district court *sua sponte* scheduled a *Fatico* hearing--*i.e.*, an evidentiary hearing relating solely to punishment, *see United States v. Fatico*, 603 F.2d 1053, 1057 & n.9 (2d Cir. 1979), *cert. denied*, 444 U.S. 1073 (1980)--in order to determine, *inter*

10

*alia*, the factual bases for (a) Velez's belief that Delacruz had sold drugs in the past and (b) the PSR's allegation that Delacruz had stated that the crew was going to harm one of the drug couriers. At the outset of the hearing, as well as later in writing and again orally at Delacruz's sentencing hearing, Aidala objected to the holding of a *Fatico* hearing into any alleged past drug dealing by Delacruz, unrelated to his offense conduct, arguing that consideration (both by the PSR and by the court) of conduct unrelated to the robbery conspiracy offense violated Delacruz's due process rights. The district court rejected this contention, orally at both hearings and in a written order.

At the *Fatico* hearing, two witnesses testified. An interpreter testified to the accuracy of Spanish-to-English translations of recorded conversations among the Cooperators, Velez, and Delacruz. Velez testified with respect to the issues raised by the district court in calling for the hearing. (*See Fatico* Hearing Transcript, November 19, 2015 ("*Fatico* Tr."), at 19-117.)

As to Delacruz's past conduct, Velez testified that he knew Delacruz had been involved in selling drugs because he and Delacruz occasionally "had done business" selling cocaine (*Fatico* Tr. 35) from some time in 2012 to the time of his arrest (*see id*. at 36), and that he "was involved with [Delacruz] in drug sales a few times" (*id*. at 87). But Velez then denied that he was "involved," saying instead, "that I was always there, like present" (*id*.). Velez testified that he did not supply Delacruz with drugs (*see id*.) and had no involvement in Delacruz's sale of drugs (*see id*. at 86), but that he "saw" Delacruz sell drugs perhaps six times (*e.g.*, *id*. at 82). Velez testified that Delacruz's sales took place near where he and Delacruz lived in Philadelphia, in "[d]aylight" hours, "outside on the street" with "people all about." (*Id*. at 86.)

Although Velez had identified Delacruz as the recorded speaker who said one of the couriers was "going to cry like a sissy," Velez did not testify that Delacruz himself intended to inflict

11

physical injury. Velez testified that his crew members had specific areas of responsibility in the planned robbery. He had discussed with Delacruz the role Delacruz would play (*see Fatico* Tr. 116), and the understanding was that Delacruz "was going to drive the [car] that was going to come up from [*sic*] New York to [*sic*] Philadelphia. Then he was going to transport the drugs that had been stolen on the return trip to Philadelphia" (*id*. at 34).

> Q. . . . Mr. Delacruz's role was to rent a car and to drive you to New York on the day of [*sic*] this fantasy robbery was to take place, correct?
>
> A. Yes.
>
> Q. His role was not to possess a weapon and it was not to actually participate in the actual robbery, correct? That was not his role, correct?
>
> A. What do you mean by participate in the robbery?
>
> Q. *He wasn't going to go into the van, as others were supposed to do, with guns drawn and actually commit the robbery*?
>
> A. *Yes*.
>
> Q. In fact, his role was the most minor of any of yours, isn't that correct?
>
> . . . .
>
> A. *His role was to come up to New York with me and then transport the drugs back to Philadelphia and help me sell them in Philadelphia.*

(*Fatico* Tr. 79 (emphases added).)

Velez testified that he had never personally participated in a robbery of drug dealers before (*see id*. at 32, 70), and to the best of Velez's knowledge, neither had Delacruz (*see id*. at 74). Velez testified that the "people that [he] expected were going to actually physically take the drugs from the people in the SUV" were Falero, Vasquez, and Feliciano. (*Id*. at 116.)

12

D. *Sentencing*

At Delacruz's sentencing hearing, the district court adopted the factual descriptions in the PSR (*see* Sentencing Transcript, December 14, 2015 ("S.Tr."), at 5), and overruled both of Delacruz's objections. As to the statement that Delacruz had previously engaged in sales of narcotics, which the court concluded was "supported by a preponderance of the evidence" (S.Tr. 7), the court found

> that that statement is appropriately included in the PSR, including with respect to this defendant, based on, among other things, the testimony of Mr. Velez at the Fatico. The Court had credited that testimony to the extent that it indicates that the defendant had had involvement in narcotics transactions.
>
> *I would note that that does not mean that the defendant is being sentenced for a conviction of participation in a narcotics conspiracy.* He did not plead guilty to that. He pled guilty only to the conspiracy to commit and participate in a Hobbs Act robbery. Nonetheless, *the Court uses the facts set forth in the PSR for overall background in terms of the crime itself but also in consideration of the 3553(a) factors.*

(S.Tr. 5-6 (emphases added); *see also id*. at 10.)

As to the PSR's suggestion that Delacruz said that he himself would harm one of the drug couriers, the court rejected Delacruz's objection, stating that it found that interpretation to be

> appropriately supported by a preponderance of the evidence based *not on a quote* as to something like that in terms of direct language but in terms of the concept, which is taken from T-100.

(S.Tr. 6 (emphasis added).) The court referred to Delacruz's recorded statement that "'I can assure you that the one in front, that, that tough guy as you say,' then 'That guy, that guy is going to cry like a sissy.'" (*Id*. at 7). It also referred to

> [Delacruz's] state[ments] that he is going to be backup when they fought and that the guy is going to cry like a sissy. I believe at least one reasonable inference, in fact

13

I would say it's a logical and *the most likely inference, is that there would be harm* that would potentially come to that fellow.

As I tried to indicate, *it wasn't a quote*, going to harm the main target drug supplier.  Those are words which are used to convey the inference.

(*Id*. at 11 (emphases added).)

The district court declined to accept the PSR recommendation that Delacruz be given credit, in the calculation of his Guidelines offense level, for acceptance of responsibility.  The court stated that

> *[t]o receive that credit, the Court must find that the defendant has truthfully admitted the conduct comprising the offense and also not frivolously contest[ed] relevant conduct that the Court determines to be true*.  I find that based upon the submissions of the defendant and the positions of the defendant, acceptance of responsibility is not appropriately included here.

> While the defendant has accepted some responsibility for his offense and has pled guilty to participating in his role, *he maintains in his submission of December 5th that he was not going to participate in a robber capacity*.  I do note that the government had indicated at one point in a submission that he had been solely a driver.

> However, the Court finds that based upon the findings of fact that it has now made, including those included in the PSR, it is absolutely clear that the defendant was heavily involved in this, that he was involved in the planning, he participated in at least a couple of the meetings.  And while *he was quiet, and I think that is clear*, and while *there may have been others who were going to be more directly involved in actually removing the drugs from the car*, he was certainly there in an important capacity.

> I also would point to the defense submission at pages 5 to 6 of the first submission, also paragraph 39 of the PSR, where *he indicated that he was going to be, **quote**, just a lookout when he spoke with probation*.  I don't believe that that is supported by the totality of the facts before the Court.  *He was not going to be just a lookout*.

So, I decline to include the acceptance of responsibility . . . .

(S.Tr. 13-14 (emphases added).)

The government, asked if it wished to comment on this, said:

One point of clarification *from the government's perspective is the government's view of the evidence was that the defendant's physical role was to be that of a driver*. The government didn't mean to imply that the defendant didn't have other responsibilities with respect to the *planning* of this crime.

(*Id*. at 14 (emphases added).)

The court adhered to its view that Delacruz had not met the requirements for acceptance-of-responsibility credit. (*See id*. at 17.) Without that credit, Delacruz's total offense level was 26, making the Guidelines-recommended range of imprisonment 63-78 months. In ordering imprisonment for 63 months, the district court stated, *inter alia*,

*it is important to the Court that you were there at the very initial planning meetings*. You were there in October during the initial meeting. You were there in November during the other meetings. You were, as I mentioned, ready, willing, and able.

You were *the go-to man for the leader* of this particular drug robbery conspiracy, Mr. . . . Velez. I believe that the transcript of the wire recording that captures you, among others, indicates that *you were deeply in this*, that *you were fully prepared and certainly understood exactly what would be required*.

I do credit the Velez testimony that you were a close friend of his, that you were involved in the narcotics trade, and that you understood that there would be 16 kilos of cocaine and 5 kilos of heroin on the other end of this, and that you believed you stood to gain from that.

I also believe that *it is significant that you were willing to participate in the aspects of the crime that would have involved the potential for violence*, namely, that *you* would have made the lead drug dealer cry like a sissy, to quote your words.

I also find significant a fact that we have not talked about, which is that your car had in it an empty suitcase and an empty fabric bag, which are tools

15

of the trade of robbers who expect to take home fruits of robbery, not just deposit into their pockets certain money that they may be paid. If you are paid large sums of money or certainly if you are paid in the form of cocaine and heroin, a suitcase and a fabric bag can come in quite useful.

(S.Tr. 27-28 (emphases added).) The court concluded:

Based upon the Court's consideration of all the factors under 3553(a), the Court does believe that a sentence of 63 months is appropriate. That is a guideline sentence. But irrespective of the guidelines, the Court would impose the same sentence in any event. It is the Court's view that it is a 3553(a) sentence, a sentence which appropriately reflects for you all of the requirements for sentencing and that it is a sufficient but not greater than necessary sentence.

(*Id*. at 29.)

## II. DISCUSSION

On appeal, Delacruz contends principally that his sentence is procedurally unreasonable because the district court miscalculated his Guidelines-recommended range of imprisonment, denying him the acceptance-of-responsibility adjustment based on clearly erroneous findings of fact. He also pursues his contentions that the holding of a *Fatico* hearing was a violation of his right to due process and that it was impermissible for the district court to credit Velez's hearing testimony.

The latter contentions are meritless, and we dispose of them at the outset. First, it has long been established that the Due Process Clause does not restrict a court with respect to the type of information it may consider for purposes of sentencing. *See, e.g.*, *Williams v. New York*, 337 U.S. 241, 246 (1949); *Apprendi v. New Jersey*, 530 U.S. 466, 481 (2000) ("[N]othing in th[e] history [of the common law of sentencing] suggests that it is impermissible for judges to exercise discretion--

16

taking into consideration various factors relating both to offense and offender--in imposing a judgment within the range prescribed by statute." (emphasis omitted)). *Williams* reflects "the underlying philosophy of modern sentencing," which "is to take into account the person as well as the crime by considering 'information concerning every aspect of a defendant's life.'" *Wasman v. United States*, 468 U.S. 559, 572 (1984) (quoting *Williams*, 337 U.S. at 250). Accordingly, federal sentencing statutes provide that the sentencing court, "in determining the particular sentence to be imposed, shall consider," *inter alia*, "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), and that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence," *id*. § 3661. "'[H]ighly relevant--if not essential--to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.' Allowing consideration of such a breadth of information ensures that the punishment will suit not merely the offense but the individual defendant." *Wasman*, 468 U.S. at 564 (quoting *Williams*, 337 U.S. at 247).

While principles of due process do not bar the sentencing judge from "consider[ing] any and all information that reasonably might bear on the proper sentence for the particular defendant," *Wasman*, 468 U.S. at 563, what the Due Process Clause does require is that a defendant not be sentenced on the basis of "materially untrue" assumptions or "misinformation," and that he have an opportunity to respond to material allegations that he disputes, in order that the court not sentence him in reliance on misinformation, *Townsend v. Burke*, 334 U.S. 736, 741 (1948); *see also* Guidelines § 6A1.3(a) ("When any factor important to the sentencing determination is reasonably in dispute, the

17

parties shall be given an adequate opportunity to present information to the court regarding that factor."). Thus, when, as here, the PSR contains a material factual assertion that the defendant disputes and that the sentencing court wishes to accept, some kind of hearing for the presentation of-- and challenge to--evidence is required, rather than barred, by principles of due process.

Second, we reject Delacruz's contention that Velez's testimony as to prior narcotics dealing by Delacruz was incredible as a matter of law. The ability of the district judge--who has seen and heard the witness--to make credibility determinations is superior to that of the appellate court, *see*, *e.g.*, *Gall v. United States*, 552 U.S. 38, 51 (2007), and the district judge as factfinder has

> considerable discretion in resolving evidentiary inconsistencies. Inconsistency may prompt a factfinder to reject both versions of an account, or to accept one over the other based on a finding that one witness's recollection is more reliable or credible than the other. Moreover, a factfinder who determines that a witness has been "inaccurate, contradictory and even untruthful in some respects" may nevertheless find the witness "entirely credible in the essentials of his testimony." *United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir.2011) (internal quotation marks omitted); *United States v. Coté*, 544 F.3d 88, 99 (2d Cir. 2008) (holding that factfinder can resolve conflicts in witnesses' testimony by rejecting extremes and concluding that truth lies "somewhere in between"),

*United States v. Messina*, 806 F.3d 55, 64 (2d Cir. 2015).

In this case, it would have been helpful for the district court to "carefully explain[] its credibility finding," *id*., especially given that there was much in Velez's testimony at the *Fatico* hearing that was vague, equivocal, or inconsistent. He testified variously, for example, as to his own prior drug dealing (*see Fatico* Tr. 27, 80, 94 (testifying both that he typically bought only 10 grams of heroin at a time, but that he had dealt in large quantities and was moving a lot of narcotics when he was first contacted by the Cooperators)); as to information he had received from the Cooperators (*see id*. at 76-77 (testifying both that the Cooperators did not tell him what kind of drugs the SUV

18

would be carrying and that the Cooperators told him the SUV would be carrying heroin and cocaine)); as to the planned disposition of the stolen drugs (*see id*. at 38, 60 (testifying both that all of the drugs were to be taken to Philadelphia to be sold there, and that some were to be retained by Esquea and Espinosa in New York)); and--most importantly with respect to his assertion that Delacruz had previously dealt drugs--as to the foundation for that assertion (*see id*. at 35, 86-87 (testifying variously that he and Delacruz "had done business" selling cocaine, but that he neither supplied Delacruz nor had anything to do with any of the sales; and that he "was involved with [Delacruz] in drug sales a few times" but that he was only "present," not involved)).

Notwithstanding these inconsistencies and equivocations in Velez's *Fatico* hearing testimony--and despite the defense argument that Velez's claim that Delacruz had previously "engaged in selling narcotics [wa]s unconvincing" because Delacruz "was not going to sell the purported narcotics" (Delacruz Sentencing Memorandum at 6)--there was independent evidence in the record to support his testimony (quoted in Part I.C. above) that he and Delacruz planned to sell the stolen narcotics (*see*, *e.g.*, *Fatico* Tr. 79). In the criminal complaint initiating this prosecution, sworn to on the day after the arrests--apparently prior to any cooperation by Velez (*see*, *e.g.*, *id*. at 29, 69 (Velez initially lied to the government about his name and his birthplace))--the DEA agent's summary of the November 5 recorded meeting among the Cooperators, Velez, and Delacruz included the description that "[VELEZ] and DELACRUZ suggested that they could sell the CW's portion of the drugs in Philadelphia on behalf of the CW" (Complaint dated November 14, 2014 ("Criminal Complaint"), ¶ 13(d)). Given the record as a whole and the district court's ability to observe Velez's testimony, we cannot conclude that it was impermissible for the court to accept his testimony that Delacruz had previously been engaged in drug sales.

19

We reach a different conclusion with respect to the district court's ruling that Delacruz should be denied credit for acceptance of responsibility.

A. *Acceptance-of-Responsibility Adjustments*

The Guidelines authorize a two-step decrease in offense level if the defendant "clearly demonstrates acceptance of responsibility for his offense." Guidelines § 3E1.1(a). Entry of a plea of guilty before trial is "significant evidence of acceptance of responsibility" but does not automatically entitle the defendant to such an adjustment. *Id*. § 3E1.1 Application Note 3. If the court decides that that adjustment is warranted, and if the defendant's offense level without any acceptance-of-responsibility credit is at least 16, the court--on motion of the government representing that the defendant has saved the government the time and effort of preparing for trial, "permitting the government and the court to allocate their resources efficiently," by giving timely notice of his intention to plead guilty--may decrease the defendant's offense level by one additional step. *Id*. § 3E1.1(b).

In deciding whether a defendant qualifies for the two-step adjustment, the district court should consider, *inter alia*, whether the defendant has

> truthfully admitt[ed] the conduct comprising the offense(s) of conviction, and truthfully admitt[ed] *or not falsely den[ied]* any additional *relevant conduct* for which the defendant is accountable under § 1B1.3 (Relevant Conduct).

*Id*. § 3E1.1 Application Note 1(A) (emphases added). Relevant conduct includes "all acts and omissions committed . . . by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or

20

responsibility for that offense." *Id*. § 1B1.3(a)(1)(A). As to relevant conduct, however, commentary to the acceptance-of-responsibility guideline specifies that

> *a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction under subsection (a)*. A defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this subsection.

*Id*. § 3E1.1 Application Note 1(A) (emphasis added). Thus, "'the paramount factor in determining eligibility for § 3E1.1 credit is whether the defendant truthfully admits *the conduct comprising the offense or offenses of conviction*,'" *United States v. Kumar*, 617 F.3d 612, 637 (2d Cir. 2010) ("*Kumar*") (quoting *United States v. Teyer*, 322 F.Supp.2d 359, 376 (S.D.N.Y. 2004) (Lynch, then-*District Judge*) (emphasis ours)), *cert. denied*, 563 U.S. 1028 (2011). A denial of acceptance-of-responsibility credit "for behavior which [the defendant] has continued to deny *and has not been proved against him beyond a reasonable doubt*" violates the Fifth Amendment. *United States v. Oliveras*, 905 F.2d 623, 631 (2d Cir. 1990) (emphasis added); *see*, *e.g.*, *United States v. Austin*, 17 F.3d 27, 29-31 (2d Cir. 1994) ("*Austin*") (defendant who was charged with illegal purchase and resale of 36 firearms but was allowed to plead guilty with regard to only five, could not be denied acceptance-of-responsibility credit for refusing to assist the government in the recovery of the remaining 31); *United States v. Santiago*, 906 F.2d 867, 871, 873-74 (2d Cir. 1990) ("*Santiago*") (sentencing court could not properly deny acceptance-of-responsibility credit based on defendant's refusal to admit past drug dealing not charged in the indictment).

Nonetheless, "a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility." Guidelines § 3E1.1 Application Note 1(A); *see*, *e.g.*, *United States v. Rivera*, 96 F.3d

21

41, 43 (2d Cir. 1996) (upholding denial of § 3E1.1 reduction where defendant had not shown "contrition and candor").  As the sentencing judge "is in a unique position to evaluate a defendant's acceptance of responsibility," her determination whether or not to grant the reduction is "entitled to great deference on review," Guidelines § 3E1.1 Application Note 5, and we will not disturb that determination unless it is "without foundation," *e.g.*, *Kumar*, 617 F.3d at 635  (internal quotation marks omitted); *United States v. Zhuang*, 270 F.3d 107, 110 (2d Cir. 2001) (internal quotation marks omitted); *United States v. Reyes*, 9 F.3d 275, 280 (2d Cir. 1993) (internal quotation marks omitted); *Santiago*, 906 F.2d at 874 (internal quotation marks omitted).

In light of a defendant's due process right to contest alleged factual errors in his PSR, his good-faith objection to material PSR statements that he disputes does not provide a proper foundation for denial of the acceptance-of-responsibility credit.  *See generally United States v. Lee*, 653 F.3d 170, 172, 174 (2d Cir. 2011) (impermissible for government to withhold a motion for the third-step reduction after defendant timely pleaded guilty but objected to a PSR assertion, thereby triggering the need for a *Fatico* hearing); *see also Austin*, 17 F.3d at 30 (holding that the district court's denial of acceptance-of-responsibility credit based on conduct "beyond the offense of conviction" lacked a proper foundation).

B. *Sentencing Procedure and Our Standard of Review*

Under the current federal sentencing regime, despite the Sentencing Guidelines having been declared advisory rather than mandatory, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. . . .  [T]he Guidelines," while not the only consideration, "should be the starting point and the initial benchmark."  *Gall*, 552 U.S. at 49.  The

court should then, "after giving both parties an opportunity to argue for whatever sentence they deem appropriate, . . . consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Id*. at 49-50.

The court of appeals reviews a sentence for both procedural and substantive reasonableness. It

> must first ensure that the district court committed no *significant procedural error, such as* failing to calculate (or *improperly calculating*) *the Guidelines range*, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, *[or] selecting a sentence based on clearly erroneous facts*.

*Id*. at 51 (emphases added).

> Assuming that the district court's sentencing decision is procedurally sound, the appellate court should then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard. When conducting this review, the court will, of course, take into account the totality of the circumstances . . . .

*Id*.; *see id*. at 41 ("courts of appeals must review all sentences . . . under a deferential abuse-of-discretion standard"); *United States v. Cavera*, 550 F.3d 180, 188 n.5 (2d Cir. 2008) (en banc) ("the 'unreasonableness' standard is a particularly deferential form of abuse-of-discretion review"), *cert. denied*, 556 U.S. 1268 (2009).

"A district court . . . necessarily abuse[s] its discretion if it base[s] its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990); *see*, *e.g.*, *United States v. Carter*, 696 F.3d 229, 232 (2d Cir. 2012).

C. *The District Court's Bases for Denying Acceptance-of-Responsibility Credit to Delacruz*

The district court's statements at the sentencing hearing indicate that the court denied Delacruz acceptance-of-responsibility credit because it viewed him as falsely attempting to minimize his participation in the robbery conspiracy, based on two findings of fact. We conclude that both findings are clearly erroneous.

1. *The "quote, just a lookout" Finding*

As quoted in Part I.D. above, one of those findings was the court's statement that the PSR reflected that "when [Delacruz] spoke with probation," "he indicated that he was going to be, *quote*, *just* a lookout" (S.Tr. 14 (emphases added)). The court found that supposed indication false because, it found, Delacruz "was not going to be just a lookout." (*Id*.) There is indeed every indication in the record that Delacruz was not to be just a lookout but was to be the getaway driver taking the stolen narcotics back to Philadelphia. But the court's finding that Delacruz told probation that his role was "just" to be a lookout is clearly erroneous. There is no statement in the PSR saying that Delacruz claimed being a lookout was his only role.

We note that in his plea allocution, Delacruz stated that his role was to be a lookout; but he did not say that that was his only role, and he was not asked at the plea hearing to elaborate on any aspect of the robbery other than what the crew had been planning to steal. It may sometimes be possible to discern from a defendant's demeanor a lack of candor indicating an attempt to conceal greater culpability; but in this case the district judge was in no position to make such an assessment since she did not preside over the plea allocution hearing. Although she accepted the plea, that hearing was conducted by a magistrate judge. And following the entry of his plea, the defense submissions

24

to the court unfailingly described Delacruz as either the "driver/lookout" or, more often, simply the "driver." (*See* Delacruz Sentencing Memorandum at 3, 5, 6; Letter from Louis R. Aidala to Hon. Katherine B. Forrest dated December 5, 2015, at 1, 3.)

The government's sentencing submission likewise noted that Delacruz described himself as either the "driver/lookout" or the "driver." (Government Sentencing Memorandum at 2 n.1., 5, 6.) The government did not suggest in any way that Delacruz had sought to deny his role as driver.

Plainly, the judge believed the PSR to have stated that Delacruz claimed to probation that he was only a lookout; that belief is clear from her precision in saying, "*quote*, just a lookout" (S.Tr. 14 (emphasis added)). And that finding stands in clear contrast to other inferences or findings that she stated were "based *not on a quote*" (*id*. at 6 (emphasis added); *see also id*. at 11 ("it wasn't a quote")). However, as the PSR nowhere says that Delacruz stated to probation that he was to be just a lookout, the court's finding that he did so state is clearly erroneous.

2. *The Finding that Delacruz Said He Would Inflict Harm*

The district court also found that Delacruz, when he told the Cooperators that one of the drug couriers would "cry like a sissy," meant that he personally would harm the courier. Addressing Delacruz at the sentencing hearing, the court said it found that "you were willing to participate in the . . . violence, namely that *you* would have made the lead drug dealer cry like a sissy, to quote your words" (S.Tr. 27-28 (emphasis added)). While "cry like a sissy" did indeed quote Delacruz's own recorded words, Delacruz did not in fact say that he would be the one to inflict the

harm. And the circumstances shown in the record provide no support for the court's finding that Delacruz meant that he would do so personally.

First, while the court found that Delacruz was Velez's "go-to man" (*id*. at 27), we have seen nothing in any of Velez's statements to indicate that Delacruz expected or was expected personally to participate in the violence. At Velez's mid-October meeting with the Cooperators--the third planning meeting, but the first that was attended by Delacruz (*see* Criminal Complaint ¶¶ 9-11)-- Velez said that "DELACRUZ would be the driver, and that the robbery crew would consist of five men" (*id*. ¶ 11(b)), and "that the robbery crew would shoot the robbery victims" (*id*. ¶ 11(c)). Velez's testimony at the *Fatico* hearing was similar. He testified that the members of his crew had various roles (*see Fatico* Tr. 116-17) and that his understanding with Delacruz was that Delacruz's role was to be the driver who brought Velez to New York and drove the stolen drugs back to Philadelphia (*id*. at 34). Velez testified that at the first meeting with the Cooperators that was attended by Delacruz, the Cooperators emphasized that Velez's crew needed "to be armed to commit th[e supposed] robbery" (*id*. at 75) because the men in the SUV would be armed and were "very dangerous" (*id*. at 38). Velez testified that he had never known Delacruz to be involved in robbing drug dealers (*see id*. at 74) and that the men who would actually seize the drugs from the couriers were Falero, Vasquez, and Feliciano (*see id*. at 116).

While the court found that Delacruz had an "important capacity" in the planned robbery (S.Tr. 14), the record indicates that his importance was as the getaway driver. The anticipated robbery "was supposed to be a situation where people ran up to a van, snatched people and got the narcotics," not a theft from a fixed location. (*Fatico* Tr. 103.) Especially with respect to a moving target, there could be no assurance of easy access to and egress from a parking place in Manhattan (indeed, when

26

the Cooperators gave the signal to leave for the site of the supposed ambush, the Dodge was in fact penned in by buses, even with the driver in it), and as Velez told the Cooperators at the meeting in which he introduced Delacruz as the driver, after the robbery the crew would want to make a "quick" exit from New York (Criminal Complaint ¶ 11(c)).

Second, contrary to the district court's finding that, with respect to the anticipated violence, "[Delacruz] w[as] fully prepared" for "exactly what would be required" (S.Tr. 27), we have seen no evidence that Delacruz had a weapon. There is of course no question that Delacruz was aware that the crew planned violence against the couriers: The surveillance tapes reveal that Velez so stated to the Cooperators at the first meeting Delacruz attended and reiterated that statement to them at the second meeting Delacruz attended; Velez said some crew members would be bringing guns. But the tapes also show, as the district court noted, that Delacruz was "quiet" in those meetings (S.Tr. 14). We have been pointed to no statements *by Delacruz* about harm coming to anyone until his recorded statement on the night of November 13, a few minutes before the supposed robbery was to take place: When Delacruz made the statement that he and Velez would be backup and that the tough guy was going to cry like a sissy, he, Velez, and the rest of the crew were assembled in Manhattan, poised to follow the Cooperators to the anticipated ambush site. Although Falero, Vasquez, and Feliciano, whose job it was to subdue the couriers and seize the drugs, had brought weapons, they apparently brought only three--the two guns and a knife found in the Dodge. And although Velez had Esquea bring him a gun, there is no evidence that a gun was brought by or for Delacruz. When Delacruz was arrested in the Buick, he was alone with nothing but an empty suitcase and an empty fabric bag.

In sum, we have seen nothing in the record to support the district court's finding that Delacruz meant, in saying that the armed and dangerous courier was going to cry like a sissy, that that was to result from harm inflicted on him by the unarmed Delacruz.

27

3. *Velez's Testimony as to Delacruz's Past Drug Dealing*

Although the district court stated that it credited Velez's testimony that Delacruz had sold narcotics in the past for purposes of considering the § 3553(a) factors, the court did not rely on that testimony in denying Delacruz credit for acceptance of responsibility--and properly so because such past conduct was neither part of the robbery conspiracy to which Delacruz pleaded guilty, nor "relevant conduct" within the meaning of § 1B1.3. *See generally United States v. Ahders*, 622 F.3d 115, 122 (2d Cir. 2010) (to be "'relevant conduct' . . . the other conduct must be 'relevant' and it must occur 'during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense'" (quoting Guidelines § 1B1.3(a)(1)). There was neither temporal overlap nor a substantive relationship between the planned robbery and the past street sales of drugs in which Delacruz was alleged to have engaged.

CONCLUSION

The district court acknowledged that Delacruz "ha[d] accepted some responsibility for his offense." (S.Tr. 13.) We conclude, for the reasons discussed above, that the two factual findings on which the court based its denial of acceptance-of-responsibility credit--the finding that Delacruz told probation he had been just a lookout, and the finding that Delacruz's "cry like a sissy" statement meant that the unarmed Delacruz personally was going to hurt the "tough" drug courier who was armed--are clearly erroneous, and that the denial of that credit was thus without foundation.

We have considered all of the government's arguments in support of Delacruz's sentence and, except to the extent indicated by our rejection of Delacruz's due process and credibility challenges, have found them to be without merit. The judgment is vacated, and the matter is remanded to the district court for resentencing.